**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Guidant Sales Corp. and
Cardiac Pacemakers, Inc.,

Plaintiffs,

v.

James Niebur and
Jason Sawyer,

Defendants.

Civil No. 01-1772 (DWF/AJB)

**MEMORANDUM**
**OPINION AND ORDER**

---

Julie K. Chosy, Esq., Robert L. Schnell, Esq., and James Poradek, Esq., Faegre & Benson, 2200 Norwest Center, 90 South 7th Street, Minneapolis, Minnesota 55402-3901, appeared on behalf of Plaintiffs.

Michael A. Lindsay, Esq. and Charles Moore, Esq., Dorsey & Whitney, Pillsbury Center South, 220 South 6th Street, Minneapolis, Minnesota 55402 and Michael J. Weber, Esq., Feldman, Gale & Weber, 201 South Biscayne Boulevard, 19th Floor, Miami, Florida 33131, appeared on behalf of Defendants.

---

## Introduction

The above-entitled matter came on for hearing before the undersigned United States District Judge on October 5, 2001, pursuant to Plaintiff's motion for a temporary restraining order. For the reasons set forth below, the Court grants Plaintiff's motion.

## Background

Guidant Corporation ("Guidant") is an Indiana corporation that develops, manufactures, markets, and sells cardiac rhythm management devices ("CRM devices"), such as pacemakers. Plaintiff Cardiac Pacemakers, Inc. ("CPI"), a corporation located in Minnesota, is a wholly-owned subsidiary of Guidant that develops and manufactures CRM devices. Plaintiff

FILED OCT 18 2001
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD________
DEPUTY CLERK________

Guidant Sales Corporation ("GSC"), also an Indiana corporation, is a wholly-owned subsidiary of CPI that distributes and sells all of Guidant's products throughout the United States.

In 1986, Defendant James Niebur began working for CPI as a sales representative of CRM devices throughout Central Illinois and parts of Iowa. At the start of his employment with CPI, Niebur signed an employment agreement that contained a non-compete clause and a Minnesota choice-of-law provision. The relevant provisions state as follows:

> 1. Non-Compete. Employee will not during the continuance of his employment and for a period of three hundred sixty (360) days following the termination, for whatever reason, of his employment (i) sell or solicit the sale of non-CPI cardiac pacemakers in the geographic areas where employee performed his duties for CPI during the year preceding termination of employment; or (ii) sell or solicit the sale of non-CPI cardiac pacemakers in the geographic areas where Employee solicited the sale of or sold cardiac pacemakers for CPI during the year preceding termination of employment; or (iii) if Employee had managerial responsibilities, induce or attempt to induce any CPI employee for whom Employee had managerial responsibilities during the year preceding termination of employment to leave his or her employment with CPI. These restrictions shall apply regardless of whether Employee acts directly or indirectly; or whether Employee acts personally or as an employee, agent, or otherwise for another. Solicitation of sales shall include all acts of service such as delivery, troubleshooting and attendance at implants, as well as sales efforts. Inducement to CPI's employ shall include all acts of recruitment such as offering employment, seeking expression of interest in employment or discussing employment opportunities.
>
> 7. Governing Law. This agreement will be construed and enforced in accordance with the laws of the State of Minnesota.

In 1996, GSC was established, and Niebur became an employee of GSC, while also consenting to the assignment of his Non-Compete Agreement to GSC. In January 2001, Niebur was promoted to regional sales manager for the Central Illinois territory. Some of the major Guidant customers in the Central Illinois territory include Memorial Medical Center in Springfield, St. John's Hospital in Springfield, and Decatur Memorial Hospital in Decatur.

Defendant Jason Sawyer began working for GSC in 1999 as a sales representative in the Central Illinois territory. Sawyer also signed a non-compete agreement that included choice-of-law and jurisdiction provisions that state as follows:

> * * *
>
> 3. <u>NON-COMPETITION</u> During the term of employment and for a period of three hundred sixty-five (365) days following the termination of employment with Guidant for whatever reason, Employee will not sell, solicit the sale of, support the sale of, support or supervise the sale or implantation or other use of, or otherwise have any involvement whatsoever with the sale, manufacturing, research and development, marketing or other business aspect of any Competitive Product in the Area of Employment. It is expressly understood that Employee may be employed by a competitor of Guidant during the three hundred sixty five (365) days following termination so long as such employment does not involve the prohibited actions specified above.
>
> * * *
>
> The restrictions contained within Section 3 shall apply regardless of whether Employee acts directly or indirectly; or whether Employee acts personally or as an employee, agent or otherwise for another.
>
> * * *
>
> 9. <u>GOVERNING LAW</u> This Agreement will be construed and enforced in accordance with the laws of the State of Minnesota.
>
> 10. <u>CONSENT TO JURISDICTION/EXCLUSIVITY OF JURISDICTION</u> Employee consents to the exercise of personal jurisdiction over Employee by the state and federal courts of the State of Minnesota. Employee agrees that such Minnesota courts shall be the exclusive forum for litigation regarding the interpretation or enforcement of this Agreement. By so agreeing, Employee understands that Employee is surrendering the right to commence litigation against Guidant outside the State of Minnesota.
>
> The term "Competitive Product" is defined as:
>
> any product, product line or service designed, developed, manufactured, marketed or sold by anyone other than CPI which performs similar functions or is used for the same general purposes as a CPI Product which, during the twelve (12) months immediately prior to the termination of Employee's employment with Guidant, Employee or persons under Employee's supervision sold, solicited the sale of,

supported the sale of, supported or supervised the implantation or other use of, or regarding which Employee or persons under Employee's supervision participated in research and development, clinical testing or engineering, or about which employee obtained Confidential Information.

The term "CPI Product" is defined as:

any product, product line or service that has been designed, developed, manufactured, marketed or sold by CPI or regarding which CPI has conducted or acquired research and development. Such products include but are not limited to, cardiac pacemakers and implantable defibrillators or products which are the functional equivalent of cardiac pacemakers or implantable defibrillators as well as leads, programmers and other devices ancillary to cardiac pacemakers or implantable defibrillators.

The term "Area of Employment" is defined as follows:

(i) The geographical area assigned by Guidant to Employee or to persons under Employee's supervision within which Employee or persons under Employee's supervision sold, solicited the sale of, supported or supervised the sale of or supported or supervised the implantation or other use of any CPI Product during the twelve (12) months immediately preceding the termination of Employee's employment with Guidant; and

(ii) The Standard Metropolitan Statistical Area or Areas within which Employee or persons under Employee's supervision sold, solicited or supported the sale of, or supported or supervised the implantation or other use of any CPI Product during the twelve (12) months immediately preceding the termination of Employee's employment with Guidant.

Sawyer, Niebur, and Kelly Welsh, another GSC sales representative, were responsible for sales in Central Illinois. For purposes of efficiency, the team divided the territory so that each was primarily responsible for certain customers. However, their compensation was based on the overall sales for the entire territory, and they each remained responsible for and capable of servicing any GSC customer in Central Illinois.

On August 17, 2001, Niebur informed GSC that he would be leaving Guidant to work for Pacesetter, Inc. ("Pacesetter"), a wholly owned subsidiary of St. Jude Medical, Inc. ("St. Jude"), a major competitor of Guidant in the CRM industry. Sawyer followed suit by resigning and

joining St. Jude on August 20, 2001. Pursuant to their contracts with St. Jude, Niebur and Sawyer have been guaranteed a salary for their first year with the company of $500,000 and $200,000, respectively.

Plaintiffs maintain that, since joining St. Jude, both Niebur and Sawyer have violated their non-compete agreements by directly and indirectly participating in the marketing and sale of CRM devices and complimentary products within the Central Illinois territory. Plaintiffs argue that Defendants' contention that they are promoting only non-CRM products for St. Jude, such as heart valves and electrophysiology devices, is unavailing because the marketing of such products provides uninterrupted access to customers they had previously cultivated for Guidant. Moreover, because these St. Jude products are often used in conjunction with CRM devices, Plaintiffs contend that Defendants are also indirectly promoting St. Jude CRM devices to customers within the Central Illinois territory. In support of their claims, primarily through third-party declarations, Plaintiffs point to instances when either or both Defendants participated in or facilitated the participation of other St. Jude employees in implantations and clinics with physicians who previously dealt only with Guidant representatives. Furthermore, Plaintiffs maintain that both Niebur and Sawyer have encouraged, with some success, the resignation of certain Guidant sales representatives so that they would then work for St. Jude.

Defendants maintain, however, that because of the nature of the CRM industry and the frequency with which sales representatives move from one company to another, Guidant and St. Jude have operated by an informal agreement to interpret and enforce non-compete agreements such as those involved in this case. Defendants maintain that because Defendants are now responsible for products distinct from the CRM devices for which they were responsible at Guidant and because they have refrained from contacting physicians with whom they personally

had substantial contact within the previous year, *i.e.*, more than five times, they are not violating their non-compete agreements as they have been consistently interpreted by both corporations involved in this case.

Moreover, Defendants maintain that even by the face of the non-compete agreements, however, they are still not in violation of their contracts with Guidant. First, with respect to Niebur, Defendants maintain that his non-compete agreement does not expressly prohibit the sale of the devices he currently promotes, apparently because his agreement does not contain the definition of "competing devices," *i.e.*, to include "devices ancillary to" CRM devices, found in Sawyer's non-compete agreement. Second, because Sawyer worked for Merck and Cordis in the Central Illinois territory prior to his employment with Guidant, Defendants maintain that any customer goodwill that Sawyer developed over the years cannot be attributed to Guidant, and thus Guidant has no protectable interest covered by the non-compete agreement.

By their current motion, Plaintiffs seek to enjoin Defendants from facilitating the sale of CRM devices and any ancillary device, either directly or indirectly, within the Central Illinois territory. Defendants directly respond to Plaintiffs' motion while also raising jurisdictional and venue challenges by a motion to dismiss.

## Discussion

### 1. Defendant's Motion to Dismiss

Defendant has filed a motion to dismiss for lack of venue and personal jurisdiction. Such a motion is potentially dispositive of the case and is thus subject to Local Rule 7.1. The Court will receive any remaining briefing papers the parties deem necessary to be filed, consistent with the Local Rules. The motion will be set for hearing in conjunction with the expected motion by Plaintiffs for a preliminary injunction.

Courts have consistently found it appropriate to enter a temporary restraining order before considering a motion to dismiss for lack of venue. *See, e.g., Goshorn v,. Bonamie*, 1998 WL 166832 (N.D.N.Y. April 8, 1998); *Terra Int'l v. Mississippi Chem. Corp.*, 922 F. Supp. 1334 (N.D. Iowa 1996); *Shell v. R. W. Sturge Ltd.*, 850 F. Supp. 620 (S.D. Ohio 1993); *Bosworth v. Ehrenreich*, 823 F. Supp. 1175 (D.N.J. 1993). The Court recognizes that the posture of this case may be distinct from that of those cited, such that the motion to dismiss was brought alongside, rather than subsequent to the motion for a temporary restraining order. However, the Court declines to attribute the emergent nature of the TRO to the motion to dismiss. If no TRO motion were involved, the motion to dismiss would be scheduled as a dispositive motion on the Court's general motion calendar, giving the parties fair and ample opportunity to brief their arguments as set forth in the local rules. In the interest of fairness and so that the issue may be fully briefed by the parties, the Court declines to decide Defendant's motion at this time.

**2. Plaintiff's Motion for a Temporary Restraining Order**

**A. Standard of Review**

Under Eighth Circuit precedent, a temporary restraining order may be granted only if the moving party can demonstrate: (1) a likelihood of success on the merits; (2) that the balance of harms favors the movant; (3) that the public interest favors the movant; and (4) that the movant will suffer irreparable harm absent the restraining order. *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). "None of these factors by itself is determinative; rather, in each case the four factors must be balanced to determine whether they tilt toward or away from granting a preliminary injunction." *West Pub. Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1222 (8th Cir. 1986), *cert. denied*, 479 U.S. 1070 (1987). The party requesting the

injunctive relief bears the "complete burden" of proving all the factors listed above. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

**B. Choice of Law Provision**

First, the parties dispute whether Minnesota or Illinois law should apply in this case. Plaintiffs point to the choice of law provisions contained in the non-compete agreements of both Defendants and maintain that Minnesota law should apply. To the contrary, Defendants contend that the Minnesota choice of law provision was not adopted in good faith and thus should be unenforceable. Defendants maintain that neither defendant had a substantial relationship with the state of Minnesota to provide a sufficient basis to invoke Minnesota law. Defendants posit that because both defendants worked in Illinois while employed by both Guidant and St. Jude, Illinois state law should apply.

Minnesota courts generally enforce choice of law provisions, unless there is evidence that the parties did not negotiate such a provision in good faith and did so with an intent to evade the law. *Medtronic, Inc. v. Gibbons*, 684 F.2d 565, 568 (8th Cir. 1982) (citing *Combined Ins. Co. v. Bode*, 77 N.W.2d 533, 536 (1956)). In its evaluation for good faith, a court must consider whether there is "significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Allstate Insurance Co. v. Hague*, 449 U.S. 302, 313 (1981). "Standing alone, a choice-of-law clause does not convey jurisdiction over a contracting party. Such a clause, however, is a heavily weighed factor in deciding whether [a party] purposefully invoked the benefits and protections of Minnesota's laws. Choice-of-law clauses demonstrate a 'defendant's deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there.'" *St. Paul Fire and*

*Marine Ins. Co. v. Courtney Enter., Inc.*, 108 F. Supp. 2d 1057, 1061 (D. Minn. 2000) (quoting *Edmonton World Hockey Enter. v. Abrahams,* 658 F. Supp. 604, 607 n.1. (D. Minn. 1987)).

By signing their non-compete agreements, both defendants clearly agreed to a Minnesota choice of law provision. In addition, however, with respect to Defendant Niebur, upon the signing of his agreement, he was working for CPI, a Minnesota corporation. This working relationship continued for 10 years, during which time he made visits to Minnesota to accompany customers on training sessions and to attend meetings. Moreover, the very products for which Niebur was responsible were manufactured in Minnesota by a Minnesota corporation even after his contract was assigned to GSC. Niebur's circumstances are much like those surrounding the defendant in *Medtronic, Inc. v. Gibbons*, where Gibbons worked first in Minnesota for a Minnesota corporation and later transferred to work in California. The *Medtronic* court found sufficient contacts with the state of Minnesota to enforce the Minnesota choice of law provision. Likewise, this Court finds sufficient contacts with the state of Minnesota to support the enforcement of Niebur's choice of law provision.

With respect to Defendant Sawyer, not only did he consent to the application of Minnesota state law, but he also agreed to the exercise of personal jurisdiction by Minnesota courts. *See Dominium Austin Partners, L.L.C. v. Emerson*, 248 F.3d 720, 726 (8th Cir. 2001 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, n.14 and *M/S BREMEN v. Zapata Off-Shore Co.,* 407 U.S. 1, 15 (1972), for proposition that the enforcement of forum-selection provisions obtained through "freely negotiated" agreements and that are not "unreasonable and unjust" does not offend due process). Moreover, Sawyer, by the products for which he was responsible, was closely affiliated with CPI, a Minnesota manufacturer. Given the nature of the products and the training required to sell them, on certain occasions, Sawyer was required to visit

Minnesota to perform his job responsibilities. While the corporate structure of the Guidant corporations clearly raises the question of whether other state law would also be appropriate, the interest in consistency among employees and the common link with the Minnesota manufacturer of the products for which the sales representatives are responsible supports the consistent use of the Minnesota choice-of-law provision.

That said, even under a choice of law analysis, as if no provision had been included in the agreements and if Illinois law were applied as Defendants propose it should be, the result would be no different. For determining choice of law, Minnesota employs the five-step analysis proposed by Professor Robert Leflar: (1) predictability of results; (2) maintenance of interstate and international order; (3) simplification of the judicial tasks; (4) advancement of the forum's governmental interests; and (5) application of the better rule of law. Robert Leflar, "Choice-Influencing Considerations in Conflicts of Law," 41 N.Y.U. L. Rev. 267, 279; *Milkovich v. Saari*, 203 N.W.2d 408, 412 (Minn. 1973). By their argument, Defendants challenge the first factor and maintain that if the Court were to apply Illinois law, it would conclude that the non-compete agreements are not reasonable and thus should not be enforced. The Court disagrees and finds that the result would indeed be the same whether Illinois or Minnesota law were to be applied. *See Medtronic, Inc. v. Benda*, 689 F.2d 645 (7th Cir. 1982) (applying Illinois law and finding protectable business interest and reasonable one-year restriction to support enforcement of non-compete agreement in CRM industry).

**C. Likelihood of Success on the Merits**

A non-compete agreement entered into at the beginning of an employment agreement does not require independent consideration and, thus, is enforceable if the agreement is found to

be reasonable. *National Recruiters, Inc. v. Cashman*, 323 N.W.2d 736, 740 (Minn. 1982); *Overholt Crop Ins. Serv. Co., Inc. v. Bredeson,* 437 N.W.2d 698, 703-04 (Minn. Ct. App. 1989). "The test of reasonableness is whether or not the restraint is necessary for the protection of the business or goodwill of the employer and, if so, whether the stipulation has imposed upon the employee any greater restraint than is reasonably necessary to protect the employer's business, regard being had to the nature and character of the employment, the time for which the restriction is imposed, and the territorial extent of the locality to which the prohibition extends." *Prow v. Medtronic, Inc.*, 770 F.2d 117 (8th Cir. 1985) (citing *Bennett v. Storz Broadcasting Co.*, 134 N.W.2d 892, 899 (1965)).

Courts in this District and others have repeatedly recognized a legitimate business interest to support the use of non-compete agreements for sales representatives in the CRM industry. *See, e.g., Prow v. Medtronic, Inc.*, 770 F.2d 117(8th Cir. 1985); *Medtronic, Inc. v. Gibbons*, 527 F. Supp. 1085 (D. Minn. 1981), *aff'd* 684 F.2d 565 (8th Cir. 1982); *Medtronic, Inc. v. Benda*, 689 F.2d 645 (7th Cir. 1982); *Medtronic, Inc. v. Janss*, 729 F.2d 1395 (11th Cir. 1984). Such legitimate interests have been primarily characterized as: (1) long-term customer relationships and the associated goodwill and (2) confidential information related to competing products and customer purchasing. *Prow*, 770 F.2d at 120; *Gibbons*, 527 F. Supp. at 1091-92; *Benda*, 689 F.2d at 647-48; *Janss*, 729 F.2d at 1400. For purposes of this motion, without reaching whether an interest in confidential information has been implicated, the Court finds that GSC and CPI have a protectable business interest in the long-term customer relationships that were cultivated by Niebur and Sawyer while they were employed by Guidant. Given the unique sales representative/customer relationship in the CRM industry and the highly competitive market, businesses such as Guidant and St. Jude are entitled to protect their customer relationships and

goodwill by reasonable provisions that do not unnecessarily burden their former employees from continuing to work within the industry.

Courts have consistently found that employment restrictions limited to one year are sufficiently reasonable. *See, e.g., Lexis-Nexis v. Beer*, 41 F. Supp. 2d 950, 957-58 (D. Minn. 1999); *Medtronic, Inc. v. Sun*, 1997 WL 729168, at *5 (Minn. Ct. App. Nov. 25, 1997); *Janss*, 729 F.2d at 1400. Moreover, the use of geographic limits based upon a former employee's sales area has also been found to be reasonable. *Lexis-Nexis*, 41 F. Supp. 2d at 957-58; *Janss*, 729 F.2d at 1400. In light of relevant precedent, the Court finds the Niebur and Sawyer non-compete agreements to be sufficiently reasonable. The one-year restriction provides Guidant sufficient time to train new sales representatives and to attempt to retain its customers in the Central Illinois territory should Niebur and Sawyer eventually return to sales in that region. At the same time, the restriction is not so long as to unreasonably and indefinitely fortify Guidant's interest in the market. Moreover, Niebur and Sawyer are not prohibited from working within the industry, but only from exploiting the goodwill, skills, and customer relationships they developed under the training and by the reputation of Guidant and its products.

The Court also finds that Plaintiffs have alleged sufficient facts that, if proven, would establish Defendants' breach of the non-compete agreements. At minimum, there is evidence that both Niebur and Sawyer indirectly promoted St. Jude CRM devices by facilitating the presence of St. Jude representatives at implants and clinics which had previously been exclusively serviced by Guidant representatives. Moreover, even if Niebur and Sawyer are only responsible for selling non-CRM devices for St. Jude, their continued contact with their former Guidant CRM customers inevitably facilitates the promotion and sale of St. Jude CRM devices. In addition, there is evidence that certain former Guidant representatives began working for

St. Jude subsequent to Niebur and Sawyer's exodus and upon their encouragement. Defendants' reliance on the purported informal agreement between Guidant and St. Jude is misplaced. While it may be that such an agreement would have facilitated a faster and more collegial resolution to this dispute, there is no evidence before the Court that the informal process superseded the express terms of the non-compete agreements. Thus, the Court finds that Plaintiffs have established a likelihood of establishing that both Defendants breached their valid non-compete agreements.

**D. Irreparable Harm**

Irreparable harm may be inferred from the breach of a valid restrictive covenant. *See Alside, Inc. v. Larson*, 220 N.W.2d 274, 278 (Minn. 1974); *Gibbons*, 527 F. Supp. at 1091. Given the nature of the protectable business interest found by the Court, if no restraint were to be imposed, then GSC and CPI would likely lose valuable business relationships in the limited market of the Central Illinois territory. Because such customer relationships were developed over significant time periods with substantial investment of Guidant training sessions and clinical support, its interest is substantial. If the restraining order does not issue, then GSC and CPI are likely to be irreparably harmed.

**E. Balance of Harms and Public Interest**

The possibility of harm to Niebur and Sawyer if the restraining order were to issue is minimal in comparison to the irreparable harm to Guidant if they have indeed violated their agreements. Niebur and Sawyer have guaranteed salaries of $500,000 and $200,000, respectively, for their first year of with St. Jude, precisely the duration of the agreements at issue in this case. Even if they have a less successful year in sales than their later years at Guidant because they are servicing a new area or selling non-competing products with which they have

less experience, they will still receive substantial compensation that has not been represented as less than what they had received at Guidant. Moreover, the public interest favors the enforcement of valid agreements and the protection of legitimate business interests in an industry propelled by vigorous but fair competition.

**F. Conclusion/Relief**

In conclusion, the Court finds that each of the factors discussed above weighs in favor of granting Plaintiff's request for a temporary restraining order.

For the reasons stated, **LET IT BE ORDERED** THAT:

1. The Court declines to decide Defendant's Motion to Dismiss (Doc. No. 15) at this time given the circumstances of its filing. Because Defendant's motion is potentially dispositive, the parties should comply with the filing requirements set forth in Local Rule 7.1(b). The Court's Order contemplates that because Defendant has already filed its Memorandum in Support, the Court will be receiving both a Memorandum in Opposition from Plaintiffs and a Reply Memorandum from Defendant, if deemed necessary. Accordingly, the Court will consider submissions by both parties and will hear arguments on both Defendant's Motion to Dismiss and Plaintiff's expected Motion for a Preliminary Injunction at a hearing to be scheduled in the near future. The parties are directed to contact Lowell Lindquist, Judge Frank's Calendar Clerk, at 651-848-1296 in order to schedule a hearing date.

2. Plaintiff's Motion for Temporary Restraining Order (Doc. No. 2) is **GRANTED** as follows:

   a. Niebur and Sawyer are each restrained and enjoined, pending completion of a hearing on a preliminary injunction, from directly or indirectly selling, soliciting the sale of, supporting the sale of, supporting or supervising the

sale or implantation or other use of, or otherwise have any involvement whatsoever with the sale, manufacturing, research and development, marketing or other business aspect of any St. Jude/Pacesetter pacemaker, implantable defibrillator, or any product ancillary to a pacemaker or implanatble defibrillator to any customer or potential customer in the geographical area in which either worked at the time of his resignation from Guidant; and

b. Niebur is restrained and enjoined, pending completion of a hearing on a preliminary injunction, from directly or indirectly inducing or attempting to induce any Guidant employee for whom Niebur had managerial responsibilities during the year preceding termination of Niebur's employment to leave his or her employment with Guidant by performing or attempting to perform one or more of the following acts: offering employment, seeking expression of interest in employment, or discussing employment opportunities;

c. Within 72 hours of this order, Plaintiff shall post a bond of $250,000.

d. The parties shall contact Kathy Thobe, Magistrate Judge Arthur J. Boylan's Calendar Clerk, at 651-848-1210, to set up a scheduling conference pursuant to Rule 26(f) of the Federal Rules of Civil Procedure.

Dated: October 18, 2001

DONOVAN W. FRANK
Judge of United States District Court