**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Guidant Sales Corp. and
Cardiac Pacemakers, Inc.,

Plaintiffs,

v.

James Niebur and
Jason Sawyer,

Defendants.

Civil No. 01-1772 (DWF/AJB)

**MEMORANDUM OPINION AND ORDER**

---

Robert L. Schnell, Jr., Esq., Charles F. Webber, Esq., Julie K. Chosy, Esq., and James Poradek, Esq., Faegre & Benson, 2200 Norwest Center, 90 South 7th Street, Minneapolis, Minnesota 55402-3901, counsel for Plaintiffs.

Michael A. Lindsay, Esq. and Charles Moore, Esq., Dorsey & Whitney, Pillsbury Center South, 220 South 6th Street, Minneapolis, Minnesota 55402 and James A. Gale, Esq., and Michael J. Weber, Esq., Feldman, Gale & Weber, 201 South Biscayne Boulevard, 19th Floor, Miami, Florida 33131, counsel for Defendants.

---

## Introduction

The above-entitled matter came on for hearing before the undersigned United States District Judge on January 11, 2002, pursuant to Defendants' Motion to Dismiss, or in the Alternative, to Transfer Venue. For the reasons set forth below, Defendants' Motion is granted in part and denied in part.

## Background

The parties were previously before the Court on October 5, 2001, pursuant to Plaintiffs' Motion for a Temporary Restraining Order which the Court granted by Memorandum Opinion

FEB 07 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

and Order, dated October 18, 2001. The same background facts serve to illustrate the foundation for the current motion before the Court.

Guidant Corporation ("Guidant") is an Indiana corporation that develops, manufactures, markets, and sells cardiac rhythm management devices ("CRM devices"), such as pacemakers. Plaintiff Cardiac Pacemakers, Inc. ("CPI"), a corporation located in Minnesota, is a wholly-owned subsidiary of Guidant that develops and manufactures CRM devices. Plaintiff Guidant Sales Corporation ("GSC"), also an Indiana corporation, is a wholly-owned subsidiary of CPI that distributes and sells all of Guidant's products throughout the United States.

In 1986, Defendant James Niebur began working for CPI as a sales representative of CRM devices throughout Central Illinois and parts of Iowa. At the start of his employment with CPI, Niebur signed an employment agreement that contained a non-compete clause and a Minnesota choice-of-law provision. The relevant provisions state as follows:

> 1. Non-Compete. Employee will not during the continuance of his employment and for a period of three hundred sixty (360) days following the termination, for whatever reason, of his employment (i) sell or solicit the sale of non-CPI cardiac pacemakers in the geographic areas where employee performed his duties for CPI during the year preceding termination of employment; or (ii) sell or solicit the sale of non-CPI cardiac pacemakers in the geographic areas where Employee solicited the sale of or sold cardiac pacemakers for CPI during the year preceding termination of employment; or (iii) if Employee had managerial responsibilities, induce or attempt to induce any CPI employee for whom Employee had managerial responsibilities during the year preceding termination of employment to leave his or her employment with CPI. These restrictions shall apply regardless of whether Employee acts directly or indirectly; or whether Employee acts personally or as an employee, agent, or otherwise for another. Solicitation of sales shall include all acts of service such as delivery, troubleshooting and attendance at implants, as well as sales efforts. Inducement to CPI's employ shall include all acts of recruitment such as offering employment, seeking expression of interest in employment or discussing employment opportunities.
>
> 7. Governing Law. This agreement will be construed and enforced in accordance with the laws of the State of Minnesota.

In 1996, GSC was established, and Niebur became an employee of GSC, while also consenting to the assignment of his Non-Compete Agreement to GSC. In January 2001, Niebur was promoted to regional sales manager for the Central Illinois territory. Some of the major Guidant customers in the Central Illinois territory include Memorial Medical Center in Springfield, St. John's Hospital in Springfield, and Decatur Memorial Hospital in Decatur.

Defendant Jason Sawyer began working for GSC in 1999 as a sales representative in the Central Illinois territory. Sawyer also signed a non-compete agreement that included choice-of-law and jurisdiction provisions that state as follows:

> * * *
>
> 3. NON-COMPETITION During the term of employment and for a period of three hundred sixty-five (365) days following the termination of employment with Guidant for whatever reason, Employee will not sell, solicit the sale of, support the sale of, support or supervise the sale or implantation or other use of, or otherwise have any involvement whatsoever with the sale, manufacturing, research and development, marketing or other business aspect of any Competitive Product in the Area of Employment. It is expressly understood that Employee may be employed by a competitor of Guidant during the three hundred sixty five (365) days following termination so long as such employment does not involve the prohibited actions specified above.
>
> * * *
>
> The restrictions contained within Section 3 shall apply regardless of whether Employee acts directly or indirectly; or whether Employee acts personally or as an employee, agent or otherwise for another.
>
> * * *
>
> 9. GOVERNING LAW This Agreement will be construed and enforced in accordance with the laws of the State of Minnesota.
>
> 10. CONSENT TO JURISDICTION/EXCLUSIVITY OF JURISDICTION Employee consents to the exercise of personal jurisdiction over Employee by the state and federal courts of the State of Minnesota. Employee agrees that such Minnesota courts shall be the exclusive forum for litigation regarding the interpretation or enforcement of this Agreement. By so agreeing, Employee

understands that Employee is surrendering the right to commence litigation against Guidant outside the State of Minnesota.

The term "Competitive Product" is defined as:

any product, product line or service designed, developed, manufactured, marketed or sold by anyone other than CPI which performs similar functions or is used for the same general purposes as a CPI Product which, during the twelve (12) months immediately prior to the termination of Employee's employment with Guidant, Employee or persons under Employee's supervision sold, solicited the sale of, supported the sale of, supported or supervised the implantation or other use of, or regarding which Employee or persons under Employee's supervision participated in research and development, clinical testing or engineering, or about which employee obtained Confidential Information.

The term "CPI Product" is defined as:

any product, product line or service that has been designed, developed, manufactured, marketed or sold by CPI or regarding which CPI has conducted or acquired research and development. Such products include but are not limited to, cardiac pacemakers and implantable defibrillators or products which are the functional equivalent of cardiac pacemakers or implantable defibrillators as well as leads, programmers and other devices ancillary to cardiac pacemakers or implantable defibrillators.

The term "Area of Employment" is defined as follows:

(i) The geographical area assigned by Guidant to Employee or to persons under Employee's supervision within which Employee or persons under Employee's supervision sold, solicited the sale of, supported or supervised the sale of or supported or supervised the implantation or other use of any CPI Product during the twelve (12) months immediately preceding the termination of Employee's employment with Guidant; and

(ii) The Standard Metropolitan Statistical Area or Areas within which Employee or persons under Employee's supervision sold, solicited or supported the sale of, or supported or supervised the implantation or other use of any CPI Product during the twelve (12) months immediately preceding the termination of Employee's employment with Guidant.

Sawyer, Niebur, and Kelly Welsh, another GSC sales representative, were responsible for sales in Central Illinois. For purposes of efficiency, the team divided the territory so that each was primarily responsible for certain customers. However, their compensation was based on the

overall sales for the entire territory, and they each remained responsible for and capable of servicing any GSC customer in Central Illinois.

On August 17, 2001, Niebur informed GSC that he would be leaving Guidant to work for Pacesetter, Inc. ("Pacesetter"), a wholly owned subsidiary of St. Jude Medical, Inc. ("St. Jude"), a major competitor of Guidant in the CRM industry. Sawyer followed suit by resigning and joining St. Jude on August 20, 2001. Pursuant to their contracts with St. Jude, Niebur and Sawyer have been guaranteed a salary for their first year with the company of $500,000 and $200,000, respectively.

Plaintiffs maintain that, since joining St. Jude, both Niebur and Sawyer have violated their non-compete agreements by directly and indirectly participating in the marketing and sale of CRM devices and complimentary products within the Central Illinois territory. Plaintiffs argue that Defendants' contention that they are promoting only non-CRM products for St. Jude, such as heart valves and electrophysiology devices, is unavailing because the marketing of such products provides uninterrupted access to customers they had previously cultivated for Guidant. Moreover, because these St. Jude products are often used in conjunction with CRM devices, Plaintiffs contend that Defendants are also indirectly promoting St. Jude CRM devices to customers within the Central Illinois territory. In support of their claims, primarily through third-party declarations, Plaintiffs point to instances when either or both Defendants participated in or facilitated the participation of other St. Jude employees in implantations and clinics with physicians who previously dealt only with Guidant representatives. Furthermore, Plaintiffs maintain that both Niebur and Sawyer have encouraged, with some success, the resignation of certain Guidant sales representatives so that they would then work for St. Jude.

Defendants maintain, however, that because of the nature of the CRM industry and the frequency with which sales representatives move from one company to another, Guidant and St. Jude have operated by an informal agreement to interpret and enforce non-compete agreements such as those involved in this case, particularly with respect to the sale of non-CRM products. Defendants maintain that because Defendants are now responsible for products distinct from the CRM devices for which they were responsible at Guidant and because they have refrained from contacting physicians with whom they personally had substantial contact within the previous year, *i.e.*, more than five times, they are not violating their non-compete agreements as they have been consistently interpreted by both corporations involved in this case.

Moreover, Defendants maintain that even by the face of the non-compete agreements, however, they are still not in violation of their contracts with Guidant. First, with respect to Niebur, Defendants maintain that his non-compete agreement does not expressly prohibit the sale of the devices he currently promotes, apparently because his agreement does not contain the definition of "competing devices," *i.e.*, to include "devices ancillary to" CRM devices, found in Sawyer's non-compete agreement. Second, because Sawyer worked for Merck and Cordis in the Central Illinois territory prior to his employment with Guidant, Defendants maintain that any customer goodwill that Sawyer developed over the years cannot be attributed to Guidant, and thus Guidant has no protectable interest covered by the non-compete agreement.

By their current motion, Defendants seek to dismiss the action against them for improper venue and lack of personal jurisdiction, or, in the alternative, to transfer venue to the Central District of Illinois.

## Discussion

### 1. Standard of Review

In deciding a motion to dismiss, the Court must assume all facts in the Complaint to be true and construe all reasonable inferences from those facts in the light most favorable to the complainant. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). The Court grants a motion to dismiss only if it is clear beyond any doubt that no relief could be granted under any set of facts consistent with the allegations in the Complaint. *Id.* The Court may grant a motion to dismiss on the basis of a dispositive issue of law. *Neitzke v. Williams*, 490 U.S. 319, 326 (1989). The Court need not resolve all questions of law in a manner which favors the complainant; rather, the Court may dismiss a claim founded upon a legal theory which is "close but ultimately unavailing." *Id.* at 327.

### 2. Issues

Defendants seek to dismiss or, in the alternative, to transfer the current action, contending that the Court lacks personal jurisdiction over the Defendants and that venue is improper in the District of Minnesota. In general, a Court addresses the question of whether it may properly exercise personal jurisdiction over the parties before it addresses the question of venue. However, "when there is a sound prudential justification for doing so," a court may resolve the issue of venue before addressing the question of personal jurisdiction. The parties agree that the question of venue is the primary question before the Court, and as such, the Court will address the venue issue first.

The current action was brought in the District of Minnesota pursuant to 28 U.S.C. § 1391(a) which provides that:

> A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in: (1) a judicial district where any defendant resides, if all defendants reside in the same state, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

First, Defendants urge the Court to adopt a hierarchical reading of § 1391(a) such that the proper venue for this case is "where any defendant resides, if all defendants reside in the same state," *i.e.*, Illinois. *See Dashman v. Peter Letterese & Assocs., Inc.*, 999 F. Supp. 553, 553-55 (S.D.N.Y. 1998); *Cobra Partners L.P. v. Liegl,* 990 F. Supp. 332, 333-34 (S.D.N.Y. 1998). Plaintiffs, by contrast, argue that § 1391(a) provides alternative bases for venue, and that while Illinois may be proper venue under § 1391(a)(1), Minnesota is equally as proper under § 1391(a)(2). Defendants, however, can point to no authority within the Eighth Circuit that stands for their proposition. Based on the plain language of the statute, the Court finds that § 1391(a) provides alternative bases rather than a strict hierarchy of bases for venue. Accordingly, the Court finds that Plaintiffs were not obligated to bring their case in Central Illinois if they could also properly establish venue here in Minnesota under § 1391(a)(2).

The question remains, however, whether venue is actually appropriate under § 1391(a)(2). Plaintiffs have listed numerous contacts that Defendants have had with the state of Minnesota: (1) both Defendants' Minnesota choice-of-law provisions; (2) Sawyer's Minnesota forum-selection clause; (3) Niebur's signature of the non-compete when working for CPI, a Minnesota corporation; (4) Minnesota manufacture and shipment of CRM devices sold by Defendants; (5) Minnesota-based 1-800-CARDIAC, providing message system between sales representatives and customers; (6) Minnesota-based Guidant technical support, medical implant

records, and marketing department; (7) payroll, benefits, and expense reimbursement distributed from Minnesota; (8) training and sales visits to Minnesota; (9) Niebur's contact with Minnesota-based area manager; (9) submission of resignations to Minnesota manager; and (10) employment with St. Jude, a Minnesota corporation.

While such contacts may be sufficient to establish personal jurisdiction, none of the contacts directly relates to the events giving rise to the claims in this case. Rather, all of the allegedly violating sales and customer contacts occurred in Central Illinois. The clear language of the venue statute requires that the contacts supporting venue must substantially give rise to the claims at issue in the given case. The contacts listed by Plaintiffs do not meet that threshold and, at most, provide only a tangential relationship with the events occurring in Illinois that allegedly support Plaintiffs' claim of breach.

The only factor in favor of Plaintiffs' argument for maintaining venue in Minnesota is the forum selection clause signed by Sawyer. Because Niebur did not sign any such agreement, the Court's analysis above supports its conclusion that venue is inappropriate here in Minnesota, at least with respect to Niebur. With respect to Sawyer, however, the appropriate determination requires further analysis.

In general, forum selection clauses are presumed valid. *See M/S BREMEN v. Zapata Off-Shore Co.*, 407 U.S. 1, 9-10 (1972); *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 31 (1988); *Knutson v. Rexair, Inc.*, 749 F. Supp. 214, 217 (D. Minn. 1990). However, they will not be enforced if the forum selection clause is unreasonable or if the contract itself is one of adhesion. *See Carnival Cruise Lines Inc. v. Shute*, 499 U.S. 585, 589 (1991); *Matthiessen v. National Trailer Convoy Inc.*, 294 F. Supp. 1132, 1135 (D. Minn. 1968). Even if a forum selection clause is found to be reasonable, however, a court should consider the totality of the circumstances to

determine whether venue is appropriately transferred under 28 U.S.C. § 1404. *Stewart*, 487 U.S. at 31.

In determining whether a forum selection clause is reasonable, courts have looked to factors such as: (1) the law governing the contract; (2) where the contract was executed; (3) where the transactions are to be performed; (4) the availability of remedies in the designated forum; (5) the public policy of the initial forum state; (6) the location of the parties, the convenience of prospective witnesses, and the accessibility of evidence; (7) the relative bargaining power of the parties and the circumstances surrounding their dealings; (8) the presence or absence of fraud, undue influence, or other extenuating circumstances; and (9) the conduct of the parties. 15 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3803.1 (2d ed. 1986) (citing *D'Antuano v. CCH Computax Sys., Inc.*, 570 F. Supp. 708, 712 (D.R.I. 1983)).

Defendants have paid short shrift to their argument that Sawyer's forum selection clause is unreasonable and thus unenforceable. Clearly, as the Court discussed above, the location of the transactions at issue and the location of the Defendants, witnesses, and evidence weigh in favor of venue in Central Illinois. However, Defendants' have presented no evidence of fraud, undue influence, or any other extenuating circumstances with respect to Defendant Sawyer's contract. Sawyer's contract specifically references both a Minnesota forum and a Minnesota choice-of-law with respect to the resolution of issues arising from the covenant not to compete. Significantly, the Court notes that while in some instances a contract between an individual and a corporation may indicate an imbalance of bargaining power, such is not the case here. Sawyer knowingly entered into a high stakes employment relationship with an explicit covenant not to compete. The Court does not find such a relationship to be inherently imbalanced and has been

directed to no compelling circumstances in this case to persuade it to decide to the contrary. The Court does not find Sawyer's forum selection clause to be unreasonable, and accordingly, finds venue in Minnesota to be proper, by agreement, with respect to Defendant Sawyer.

Plaintiffs negotiated a valid contractual provision rendering venue in Minnesota to be appropriate with respect to Defendant Sawyer. However, such an agreement cannot be expanded to impose a Minnesota venue with respect to Defendant Niebur, a non-party to the relevant agreement. Conversely, the Court's analysis finding venue to be proper in Central Illinois with respect to Niebur could arguably be applied to Defendant Sawyer as well. However, the Court declines to void a valid agreement between Plaintiffs and Sawyer solely to simplify the current litigation. Common sense and the interests of efficiency would dictate that the litigation against both Defendants would be better waged in the same venue, and, as such, the Court is reluctant to split the case between two venues. However, the Court declines to create a contract for which neither party bargained nor to eviscerate a contract for which sufficient bargain was made. The parties have created the disjunctive situation that will now be faced by two courts. The Court is of the belief that an agreement between the parties could remedy the current situation. Until such event, however, the Court shall maintain jurisdiction over the current action with respect to Defendant Niebur and will transfer venue for the current action with respect to Defendant Sawyer to the Central District of Illinois.

For the reasons stated, **LET IT BE ORDERED** THAT:

1. Defendants' Motion to Dismiss, or, in the Alternative, to Transfer Venue (Doc. No. 35) is **GRANTED IN PART AND DENIED IN PART** such that:

a. Venue is proper in the District of Minnesota with respect to Defendant Sawyer, and, as such, the Court retains jurisdiction over the current action with respect to Defendant Sawyer; and

b. The Court transfers venue of the case with respect to Defendant Niebur to the Central District of Illinois.

Dated: February 24, 2002

DONOVAN W. FRANK
Judge of United States District Court